# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 11-CR-0166-001-CVE |
| ) | |
| DAVID GLEN SHUCK, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

Now before the Court is Defendant's Motions to Suppress and Legal Memorandum (Dkt. # 20). Defendant David Glen Shuck is charged by indictment with one count of conspiracy to manufacture marijuana, one count of manufacturing 100 or more marijuana plants, two counts of using and maintaining a place for the purpose of manufacturing marijuana, and one count of possession with intent to distribute marijuana. Dkt. # 2.

Defendant Shuck has moved to suppress any and all evidence seized during the search of a residence in Mannford, Creek County, Oklahoma (Mannford property) conducted on July 29, 2011, pursuant to a warrant issued on July 27, 2011, and any and all evidence seized during the search of a residence in Sand Springs, Tulsa County, Oklahoma (Sand Springs property) pursuant to a warrant issued on July 29, 2011. Defendant argues that the evidence should be suppressed because: the deputies lacked authority to conduct a "knock and talk" at the Mannford property; the deputies illegally entered the Mannford property; and the information leading deputies to the Sand Springs property was acquired as a direct result of the allegedly

illegal search of the Mannford property.[1]  An evidentiary hearing was held on all issues on January 6, 2012.

## I.

Following the evidentiary hearing, the Court finds as follows:  On July 27, 2011, the Creek County Sheriff's Office received a complaint from a citizen that he believed marijuana was being grown on his next-door-neighbor's property.  Detective Leslie Ruhman of the Creek County Sheriff's Office spoke to the citizen on the telephone and approximately thirty minutes later, Detective Ruhman, accompanied by Undersheriff Richard Ishmael and Detective Matthew Greco-Lucchina (Detective Greco), arrived at the citizen's residence.  The citizen stated that he and his relatives had detected the smell of marijuana from his neighbor's property and that he believed the neighbor was growing marijuana.  The neighbor did not state when he had last smelled marijuana coming from the property.  None of the deputies observed the smell of marijuana at that time.  Detective Ruhman observed that the citizen's property was no more than 50 yards away from the neighbor's property.  The citizen further stated that he knew two men named Vincent Watson and David Shuck often frequented the property, and he had seen them there a few days prior.  The citizen also gave the deputies a license plate number of the car driven by Watson and a description of the car driven by Shuck.

Following their interview with the citizen, the deputies drove down the driveway onto the main highway, and turned from the highway into the driveway of the adjacent Mannford

---

[1]  Defendant initially argued in his motion that evidence seized during the search of the Sand Springs property must be suppressed because the woman who consented to the search did not have authority to consent, and because her complete statements to deputies were not included in the affidavit in support of the search warrant.  At the conclusion of the evidentiary hearing, defendant's counsel stated that he was withdrawing these portions of the motion.  These portions of defendant's motion are deemed moot.

property. The deputies intended to make contact with someone inside the residence and to ask him or her about any illegal activity. As they drove up the driveway of the Mannford property, the deputies observed a trailer with an add-on connected to the back. The front door of the trailer was on the east side of the house, faced the street, and had a surveillance camera above it. The front yard was encircled by a chain-link fence and contained a parking pad where a boat was parked. The fence had a gate in the center and a double-gate in front of the parking pad where the boat was parked. The deputies observed that the gate was locked. No other entrance was visible from the front of the house. The deputies also observed that all the windows of the house were boarded up or covered in some fashion.

Detective Ruhman testified that it appeared the gate in the front yard "hadn't been used in a while" because there was "dirt around the bottom of it where it hadn't been moved." Detective Ruhman surmised that the occupants must have been using a separate entrance on another part of the trailer. Hoping to find an accessible door, Detective Ruhman walked around to the north side of the trailer, where he saw a side door on the add-on unit.[2] This door was on the north side of the house and did not face the street. This door also had a surveillance camera above it, and it was the only door the deputies saw other than the front door. The side door was not obstructed from public access in any way, and the deputies did not have to pass through any fencing or other obstacle to reach the side door. Undersheriff Ishmael testified that the driveway curved around to the side of the residence toward the back of the house and that the side door

---

[2] Although the parties refer to the door as a "back door," according to Government Exhibit 1 introduced at the evidentiary hearing, the door is on the north side of the residence, and faces the side, not the back, of the property. See Dkt. # 23-3.

appeared to be "the most traveled access" to the house. Detective Ruhman knocked on the side door, but there was no answer.

Next to the side door, no more than two feet away, the deputies noticed a PVC pipe coming out of the house and dripping water from its end. The pipe was only a few inches from the ground and stuck out several feet. Other than some long grass growing at the end of the pipe, it was not obstructed from view in any way. Detective Ruhman testified that the pipe was "hard to miss." While Detective Ruhman was knocking on the door, Detective Greco knelt down to where the water was dripping out of the pipe and stated that he smelled marijuana. Receiving no answer to their knock at the door, the deputies left the property.

Upon arriving back at his office, Detective Ruhman contacted the Creek County Rural Water District Number Five in order to get information about the water service for the Mannford property. Detective Ruhman learned that the water service was registered in the name of David Shuck, and that the residence used anywhere from 1,000 to 2,000 gallons of water each month. Based on his experience and training as an investigator of marijuana cultivation operations, Detective Ruhman knew that this was very high water usage for a residence of this size, and that high water usage was often indicative of a marijuana growing operation. In light of this information, as well as his knowledge that marijuana growing operations often have surveillance cameras and boarded up windows, Detective Ruhman formed the opinion that a marijuana growing operation was being conducted at the Mannford property. Detective Ruhman prepared an affidavit seeking a search warrant for the Mannford property, and the search warrant was issued by a state court judge on July 27, 2011.

Before executing the search warrant, Detective Ruhman spent a day and a half watching the Mannford property in the hope that someone would return to the trailer. On July 29, 2011, after no one had visited the trailer in almost two days, Detective Ruhman executed the search warrant with Undersheriff Ishmael and Deputy Kevin Haney. The deputies entered the house by scaling the fence in the front yard and kicking in the front door. Throughout the trailer, deputies found marijuana and marijuana growing paraphernalia, including chemicals used to grow plant material, numerous marijuana plants up to nine feet tall, several trash bags full of marijuana, and high pressure lights and fans associated with growing marijuana.

Having found marijuana at the Mannford property, the deputies were eager to contact David Shuck. A search of Department of Public Safety records had shown that Shuck had another residence in Sand Springs, Tulsa County, Oklahoma. Detective Ruhman contacted the Tulsa County Sheriff's Office to ask for assistance in conducting a knock and talk at the Sand Springs address. Undersheriff Ishmael left the Mannford property and met Deputy Sheriff David Long of Tulsa County near the Sand Springs property to brief Deputy Long on the investigation. Undersheriff Ishmael and Deputy Long then proceeded to the Sand Springs property, and knocked on the door.

The door of the Sand Springs property was answered by Shuck's girlfriend, Lina Copeland. Copeland told the deputies that Shuck was not home. Copeland informed the deputies that she lived at the residence, and the deputies noted that the address on Copeland's driver's license was the address for the Sand Springs property. Deputy Long informed Copeland of her <u>Miranda</u> rights and she signed a Notification of Rights form. The deputies asked Copeland if they could search the residence, and she agreed. Copeland signed a waiver giving

her consent to the search. Deputies walked through the home with Copeland, whereupon they smelled marijuana and observed marijuana paraphernalia, bags of marijuana, and a locked gun safe. Deputies then sought and obtained a warrant to search the premises. During the search, they found more marijuana and over $1,500 cash.

## II.

Defendant first argues that the deputies were not authorized to approach the Mannford property to perform a knock and talk because there was no evidence that the neighbor had smelled marijuana recently. The Tenth Circuit has recognized that a "knock and talk" procedure, where the police approach a property, knock on the door, and converse with an occupant, is a legitimate investigative tool. See United States v. Cruz-Mendez, 467 F.3d 1260, 1264-65 (10th Cir. 2006). Furthermore, the Tenth Circuit has held that a knock and talk "is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion." Id. at 1264; see also United States v. Hendrix, -- F.3d --, 2011 WL 6358522, at *4 n.2 (10th Cir. Dec. 20, 2011); United States v. Hernandez-Chaparro, 357 Fed. Appx. 165, 167 (10th Cir. 2009).[3] Thus, the deputies in this case were entitled to approach the residence and knock on the door regardless of whether they had a reasonable suspicion that illegal activity was occurring. It is irrelevant whether the neighbor's information was stale because the approach of the residence and knock on the door did not implicate the Fourth Amendment.

Defendant next argues that, even if the deputies were entitled to perform the knock and talk, they violated his Fourth Amendment rights by going to the side door and smelling the PVC pipe. Defendant, relying on United States v. Hatfield, 333 F.3d 1189 (10th Cir. 2003), argues

---

[3] Unpublished decisions are not precedential, but may be cited for their persuasive value. See Fed. R. App. P. 32.1; 10th Cir. R. 32.1.

that by going to the side door, the police improperly invaded the curtilage of his property and, thus, their observations were in violation of the Fourth Amendment. Defendant is correct that the Tenth Circuit in Hatfield stated that "if the investigators had physically breached the curtilage there would be little doubt that any observations made therein would have been proscribed." Id. at 1197 (internal quotations omitted). However, defendant ignores the fact that the Tenth Circuit explicitly allowed for an exception to this rule when police are on a portion of the property that is open to the public and where visitors would be expected to go. "When the police come on to private property to conduct an investigation and restrict their movements to places visitors could be expected to go (e.g., walkways, driveways, porches), observations made from such vantage points are not covered by the Fourth Amendment." Id. at 1194 (internal quotations omitted).

In addition to allowing police officers to be on portions of the property where visitors could be expected to go, the Tenth Circuit has also held that merely going into the backyard of a property is not, in and of itself, a Fourth Amendment violation. See United States v. Cavely, 318 F.3d 987, 994 n.1 (10th Cir. 2003) ("The mere fact that officers went to the front and around towards the back of appellant's house, standing alone, does not establish an invasion of the curtilage."); see also Galindo v. Town of Silver City, 127 Fed. Appx. 459, 466 (10th Cir. 2005) (unpublished) ("Merely proceeding from the front to the back of a house alone, however, did not establish an invasion of the curtilage in violation of the Fourth Amendment."). Similarly, other circuits have held that the principles allowing for a knock and talk procedure at a front door can be extended, in some circumstances, to allow the officers to approach a back door without implicating the Fourth Amendment. See United States v. Daoust, 916 F.2d 757, 758 (1st Cir.

1990) ("if the [front] door is inaccessible there is nothing unlawful or unreasonable about going to the back of the house to look for another door as part of a legitimate attempt to interview a person"); United States v. Bradshaw, 490 F.2d 1097, 1100 (4th Cir. 1974) ("[W]e cannot say that [the federal agent] exceeded the scope of his legitimate purpose for being there by walking around to the back door when he was unable to get an answer at the front door."); United States v. Thomas, 430 F.3d 274, 280 (6th Cir. 2005) (holding that Fourth Amendment was not implicated by police officers going to back door where it appeared that was the "primary entrance"); United States v. Raines, 243 F.3d 419, 421 (8th Cir. 2001) ("[deputy] did not interfere with [defendant's] privacy interest when he, in good faith, went unimpeded to the back of [defendant's] home to contact occupants of the residence"); United States v. Garcia, 997 F.2d 1273, 1279-80 (9th Cir. 1993) ("If the front and back of a residence are readily accessible from a public place . . . the Fourth Amendment is not implicated when officers go to the back door reasonably believing it is used as a principal entrance to the dwelling.").

In this case, Deputy Ruhman testified that the front door did not appear to be the usual mode of entry into the trailer because the gate surrounding it was locked and had an accumulation of dirt around it. Undersheriff Ishmael testified that the driveway appeared to lead around to the back of the trailer and that the side door looked like "the most traveled access" to the house. Furthermore, the side door was not obstructed by a fence or a gate or any other method of keeping out the public. Given these facts, it was reasonable for the officers to conclude that the side door was the primary access to the trailer and that it was where the public would be expected to go to make contact with the occupants of the trailer. Thus, the deputies

were within "places visitors could be expected to go" when they went to the side door, and their observations do not implicate the Fourth Amendment. Hatfield, 333 F.3d at 1194-95.[4]

Defendant argues that the exception in Hatfield should not apply to this case because Hatfield, and the cases cited therein, dealt with observations made by police from driveways, which have been specifically held to be open and accessible to the public. Hatfield, 333 F.3d at 1194-95. Because the observations in this case were not made from a driveway, defendant argues that the reasoning in Hatfield should not apply. While defendant is correct that the facts in Hatfield involved observations made from a driveway, there is no language in Hatfield, or the cases cited therein, suggesting that the Fourth Amendment exception regarding "places visitors could be expected to go" was intended to apply exclusively to driveways. To the contrary, Hatfield states that such areas include "walkways, driveways, porches." Id. Defendant has not

---

[4] After the evidentiary hearing, Defendant submitted two supplements to his motion containing a "proffer" and an amended "proffer" that the side door to the trailer on the Mannford property did not have a lock on it, but was kept closed "from the inside by the use of two 'L' brackets with a 2" by 4" piece of wood placed across the brackets." Dkt. ## 24 at 1, 26. Even if the Court were to accept the proffered information as true, it does not change the analysis. Defendant is apparently attempting to argue that, because the door was secured in this fashion, it could not have been the door habitually used for access to the trailer. However, if the brackets were present, they were secured on the inside and there is no allegation they were visible from the outside of the house. The deputies could not see the brackets and, based on their observations of the trailer, were reasonable in their assumption that the side door was the primary means of access.

9

cited any legal authority suggesting that the public area exception cannot be extended beyond a driveway if the area is still a place visitors could be expected to go.[5]

Defendant next argues that, even if the deputies were entitled to approach the side door, Detective Greco performed an illegal search when he got down on his knees to smell the PVC pipe. Defendant's counsel likens Detective Greco's actions to an enhanced search procedure, such as the use of a narcotics sniffing dog or sense-enhancing technology like that discussed by the Supreme Court in Kyllo v. United States, 533 U.S. 27, 34 (2001), which would implicate the Fourth Amendment. This argument is unavailing. The fact that Detective Greco had to get down on his knees to smell the pipe does not rise to the level of employing technology that "is not in general public use." Id. Detective Greco did not employ any technique that was not available to any member of the general public and, as such, his smelling of the PVC pipe was not a search implicating the Fourth Amendment.

Finally, defendant argues that evidence seized from the Sand Springs property should be suppressed because deputies were only alerted to the Sand Springs property by means of their allegedly illegal search of the Mannford property. Because the Court finds that there was no Fourth Amendment violation in the deputies' search of the Mannford property, defendant's argument fails.

---

[5] Defendant's counsel stated during the evidentiary hearing that it would have been preferable for the deputies to scale the fence in order to knock on the front door. Based on the legal authority cited above, this Court is not inclined to condone police unilaterally scaling a locked gate, given the circumstances present in this case. If the deputies had done so, it is highly likely that defendant's argument would have been that deputies had no right to scale his fence or locked gate.

**IT IS THEREFORE ORDERED** that Defendant's Motions to Suppress and Legal Memorandum (Dkt. # 20) is **denied**.

**IT IS SO ORDERED** this 9th day of January, 2012.

_____
CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT